# In the United States Court of Federal Claims

No. 19-219C
(Filed: April 22, 2019)
**\*Opinion originally filed under seal on April 4, 2019**

|  |  |  |
|---|---|---|
| VERTEX AEROSPACE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Bid Protest; Post-award; Judgment on |
| | ) | the Administrative Record; Motion to |
| v. | ) | Dismiss; Motion to Supplement; |
| | ) | Motion to Dismiss for Lack of Subject |
| THE UNITED STATES, | ) | Matter Jurisdiction; RCFC 12(b)(1); |
| | ) | Timeliness; *Blue & Gold* Waiver. |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DYNCORP INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*W. Jay DeVecchio,* Washington, D.C., for plaintiff. *J. Alex Ward*, *James A. Tucker*, *R. Locke Bell*, and *Caitlin A. Crujido*, Washington, D.C. of counsel.

*Adam E. Lyons,* Civil Division, United States Department of Justice, Washington, D.C., with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kircshman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *R. Montana Erickson*, Assistant Counsel, Naval Air Warfare Center, Training Systems Division, Department of the Navy, Washington, D.C., of counsel.

*Scott M. McCaleb*, Washington, D.C., for defendant-intervenor. *Brian G. Walsh*, *Moshe B. Broder*, and *Colin J. Cloherty*, Washington, D.C. of counsel.

## OPINION

**FIRESTONE**, *Senior Judge*

This post-award bid protest has been brought by the incumbent contract holder,

Vertex AeroSpace, LLC ("Vertex" or "plaintiff"), against the United States Department

of the Navy (the "Navy") in connection with a procurement decision for a broad range of helicopter maintenance, recovery, supply, and repair services for the Navy's flight training operations at the Naval Air Station Whiting Field ("NAWSF") in Florida. The awardee, DynCorp International, LLC ("DynCorp"), intervened without objection on February 8, 2019. (ECF No. 13). Vertex's complaint has four counts. In Count I, Vertex claims that the Navy acted arbitrarily and capriciously and abused its discretion when it assigned Vertex's proposal a Moderate Technical Risk Rating. In Count II, Vertex claims that the Navy acted arbitrarily and capriciously and abused its discretion when it failed to assign DynCorp a Moderate or High Technical Risk Rating. In Count III, Vertex alleges that the Navy acted arbitrarily and capriciously and abused its discretion when the Navy concluded that DynCorp's proposal provided the best value for the Navy. Finally, in Count IV, Vertex argues that the Navy acted not in accordance with law when the Navy failed to amend the Solicitation despite allegedly having determined that the Solicitation did not reflect the Navy's requirements.

Pending before the court is: (1) the government's and DynCorp's motions to dismiss Count IV of Vertex's complaint under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") on the grounds that the claim is not timely and under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted (ECF Nos. 35, 38); (2) Vertex's motion to supplement the administrative record with documents relevant to Count IV of Vertex's complaint (ECF No. 40); and (3) the parties' cross-motions for judgment on the administrative record (ECF Nos. 41, 42, 43).

For the reasons that follow, the court finds that the Navy was not arbitrary and capricious, and the Navy did not abuse its discretion in its evaluation of Vertex's and DynCorp's proposals and in deciding that DynCorp's proposal provided the best value for the Navy. Thus, the government's and DynCorp's motions for judgment on the administrative record for Counts I, II, and III are **GRANTED** and Vertex's motion for judgment on the administrative record for Counts I, II, and III is **DENIED**.

The court also finds that Count IV of Vertex's complaint is not timely and Vertex waived this claim by failing to raise it before award. Therefore, the government and DynCorp's motions to dismiss Count IV are **GRANTED**. Vertex's motion to supplement the administrative record with regard to Count IV and the cross-motions for judgment on the administrative record with regard to Count IV are **DENIED AS MOOT**.

## I. FACTUAL BACKGROUND

The Navy issued the subject Request for Proposals ("RFP") No. N61340-18-R-0905 on December 7, 2017. Administrative Record ("AR") 11976.[1] The RFP sought proposals for a contractor to "provide all logistics support services including labor, services, equipment, tools, direct and indirect material . . . required to support and maintain all Navy TH-57 aircraft,[2] aircraft systems, and related support equipment[.]" AR 8768. The contract is to be for two years, with two one-year options thereafter. AR 8754.

---

[1] The RFP was amended eight times, but those amendments are not at issue. AR 14320, 14441, 14565, 14767, 14773, 15128, 15314, and 15557.
[2] TH-57 refers to a specific type of helicopter which is a variation of the commercial Bell Jet Ranger. AR 438.

A.      **The RFP Evaluation Criteria And Proposed Work**

The RFP provided that proposals would be evaluated on a best-value tradeoff approach based on the following three factors listed in descending order of importance: technical, past performance, and price. AR 8754. The RFP stated that "[i]n addition, the Offeror's technical proposal will be reviewed to determine if it is consistent with the cost/price proposal where applicable, and reflects a clear understanding of the scope of work necessary to meet the solicitation requirements." AR 940. The RFP stated that "[t]he burden of proof for all substantiation within the proposal rests with the Offeror." AR 12715.

Under the RFP, the technical factor provided for two assessments: (1) an assessment of the offeror's compliance with the RFP's requirements which would make up the technical rating; and (2) an assessment of the risk associated with the offeror's proposed approach which would make up the Technical Risk Rating. AR 941. Regarding the Technical Risk Rating, the RFP states that the Technical Risk Rating will be based on "the potential for disruption of schedule, increased cost, degradation of performance, the need to increase Government oversight, or the likelihood of unsuccessful contract performance." AR 941.  Offerors were required to provide information about their approach to maintenance and flight line operations, operations experience, supply support experience, manning, transition phase-in, quality control, and small business utilization strategies. AR 927-28. Of significance in this case, offerors needed to demonstrate operational experience and to show experience in "performing aircraft maintenance and flight operations at a high operational tempo[,]" "performing aircraft maintenance and

4

flight operations on rotary wing aircraft[,]" and "utilizing Naval Aviation Maintenance Program (NAMP) processes[.]" AR 927. Offerors were also required to demonstrate operational experience through the "use of contracts submitted for Past Performance." *Id.* The RFP stated that operational experience would "not be a component of the Technical Rating; rather, the evaluation will only assess risk (i.e., risk reducers or significant weakness) as a component of the Technical Risk Rating." [3]

Under the terms of the RFP, offerors would be rated either acceptable or unacceptable for their technical rating. AR 943. Regarding the Technical Risk Rating, the RFP provided that a range of ratings including ratings of Low, Moderate, High, and Unacceptable would be given. AR 944. In determining the Technical Risk Rating, the RFP indicated that the Navy would identify risk reducers, weaknesses,[4] significant weaknesses,[5] and deficiencies[6] in an offeror's proposed approach. AR 944-45. A Low Technical Risk Rating would be given to proposals where the "[p]roposal may contain weakness(es) which have little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties." AR 944. A Moderate Technical Risk Rating would be given to proposals where the proposal "contains a

---

[3] The RFP defined a risk reducer as an "aspect of an Offeror's proposal that reduces risk in a way that will be advantageous to the Government during contract performance." AR 944.

[4] The RFP defined a weakness as "a flaw in the proposal that increases the risk of unsuccessful contract performance." AR 945.

[5] The RFP defined significance weakness as "a flaw that appreciably increases the risk of unsuccessful contract performance." AR 945.

[6] The RFP defined a deficiency as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." AR 945.

significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties." *Id.* A High Technical Risk Rating would be given to a proposal that "contains a significant weakness or combination of weaknesses which is likely to cause significant disruption of schedule, increased cost or degradation of performance, is unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring." *Id.* Finally, the RFP stated that a proposal would receive an Unacceptable Technical Risk Rating if the proposal "contains a material failure or a combination of significant weaknesses that increases the risk of unsuccessful performance to an unacceptable level." *Id.* By its terms, the RFP provided that a High Technical Risk Rating would make the offer unawardable. AR 941.

In addition to the foregoing regarding the Technical Risk Rating, the RFP stated that the "Government will also perform a price realism analysis" for several Contract Line Item Numbers ("CLINs") including CLIN 0X08. AR 945.[7] Under CLIN 0X08, depot conditional maintenance, the contractor is required to provide the labor necessary to perform the depot-level maintenance and repairs that are identified in the Aircraft Condition Inspection ("ACI"). AR 440. The RFP stated "for CLIN 0X08, the adequacy of the buildup of the composite labor rate may be assessed a significant weakness under the

---

[7] The RFP defined price realism to mean that the prices in an offeror's proposal "(1) Are realistic for the work to be performed; (2) Reflect a clear understanding of the requirements; and (3) Are consistent with the various elements of the Offeror's technical proposal." AR 945.

Technical Factor evaluation." AR 942. CLIN 0X08 was singled out for closer scrutiny

because CLIN 0X08 did not have a "predefined scope of work." AR 444. Rather, the

work would be based on the Navy's needs and the offeror's proposed composite labor

rate. AR 443. The RFP also stated that proposing "a profit of less than three percent (3%)

for CLINs 0X01, 0X02, 0X04, 0X07, or 0X08" may result in a significant weakness

which may "result in a Moderate Technical Risk Rating." AR 444.

The RFP provided guidance for providing buildup for composite labor rates for

CLIN 0X08. The RFP stated that the "[o]fferor shall identify the indirect rates . . . used in

the proposal." AR 934. It further required that offerors "identify whether the indirect

rates proposed are [Forward Pricing Rate Agreements ("FPRAs")], [8] [Forward Pricing

Rate Recommendations ("FPRRs")], [9] [Forward Pricing Rate Proposals ("FPRPs")],

[Collective Bargaining Agreements ("CBAs")], [Area Wage Determinations ('AWDs")],

[Administrative Contractive Officer ("ACO")]/[Defense Contracting Audit Agency

("DCAA")] recommended rates, or Offeror proposed rates." AR 934-35. The RFP stated

that "[i]f indirect rate proposals are from other than FPRAs, CBAs, AWDs, ACO/DCAA

recommended rates or Offeror proposed rates then the Offeror shall clearly identify the

source of the indirect rates and substantiate their buildup." AR 935. The RFP required the

---

[8] FAR § 2.101 defines FPRAs as "a written agreement negotiated between a contractor and the Government to make certain rates available during a specified period for use in pricing contracts or modifications. These rates represent reasonable projections of specific costs that are not easily estimated for, identified with, or generated by a specific contract."

[9] FAR § 2.101 defines FRPPs as "a rate set unilaterally by the administrative contracting officer for use by the Government in negotiations or other contract actions when forward pricing rate agreement negotiations have not been completed or when the contractor will not agree to a forward pricing rate agreement."

offeror to provide any "FPRA, FPRR, FPRP documents used" and for the Offeror to provide "a schedule which contains the proposed burden rates by year for material, direct labor overhead, General and Administrative (G&A) expense, and any other applicable burden applied to direct cost elements and shall include how the burden rates are calculated or built up." *Id.*

Regarding the past performance factor, the RFP indicated that each offeror will be given a Performance Confidence Rating of "Substantial, Satisfactory, Neutral, Limited, and No Confidence." AR 944. The past performance evaluation was intended to allow the Navy to evaluate the offeror's "demonstrated past performance in delivering quality products and services similar to the solicitation requirements[.]" AR 942. The RFP explained, however, that whether an offeror's past performance would be relevant for this solicitation would depend on the Navy's evaluation of the "scope, magnitude, and complexity" of the prior work and the "nature of the work performed, number of flight hours, and number of aircraft." *Id.* Only work determined to be Very Relevant[10] or Somewhat Relevant[11] would be considered. *Id.*

---

[10] The RFP defined Very Relevant as "[p]resent/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires." AR 945. It further indicated that the same scope, magnitude, and complexity can be found where the "Offeror has demonstrated performance as the Prime Contractor or JV Team Member in a high Operational Tempo environment: (1) in Aircraft Flight Operations/Coordination on rotary wing aircraft **AND** (2) in Aircraft Maintenance on rotary wing aircraft." *Id.*

[11] The RFP defined Somewhat Relevant as "[p]resent/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires." AR 945. Specifically, here the Somewhat Relevant rating applied if the offeror "demonstrated performance supporting at least 10,000 flight hours annually **AND** at least 40 aircraft at one site in either: (1) Aircraft Flight Operations/Coordination **OR** (2) Aircraft Maintenance." AR 946.

Finally, with regard to Price, the RFP indicated that prices for CLINS would "be evaluated to determine reasonableness, completeness, and to ensure [CLINs] contain no material imbalances." *Id*. Under the RFP, the Navy reserved the right to open discussions and request revised proposals if the Navy determined that doing so was in the Navy's best interest. AR 940.

### B.   Initial Proposal, Discussions, and Final Proposals

Vertex and DynCorp were the only offerors to timely submit proposals to the Navy. AR 444, 8755. Both Vertex and DynCorp's proposals were based on the Navy's identified need of support for "up to 6,500 scheduled flight hours per month," plus an additional amount of variable flight hours.[12] AR 14201.[13] After the proposals were submitted, the Navy decided to open discussions and sent evaluation notices ("EN") to both offerors. AR 8755. Vertex had initially proposed Manufacturing Overhead rates ranging from [. . .] to [. . .] at the Crestview site. AR 135012. Vertex proposed G&A rates ranging from [. . .] to [. . .]. *Id.*

The Navy issued EN l3-CP-022 to Vertex. In the EN the Navy asked Vertex to explain its Manufacturing Overhead rates. The Navy explained that it appeared that Vertex had "identified . . .rates . . . derived from an unpublished overhead expense forecast" but "did not provide any detail to substantiate its buildup[.]" AR 135080. In

---

[12] The RFP defined Variable Flight Hours as "those scheduled flight hours needed that exceed the hours in the Fixed Price Flight Hour CLIN 0X01." AR 14201-202.

[13] Vertex had questioned the decision to schedule only 6,500 flight hours per month, and the Navy confirmed that under the contract, CLIN 0X01 is scheduled for 6,500 scheduled hours and if it required "more scheduled hours than 6500 per month" the additional hours "will be ordered under CLIN 0X02." AR 11784.

response, Vertex provided the Navy with "Pricing and Estimating Bulletin 003: Forward Pricing Rates (FPR)" which Vertex stated substantiated "the proposed Indirect Rates." AR 135081. The Bulletin was signed and approved by Vertex. AR 135083. Vertex also stated that two rates in question contained [. . .] percent "challenge[s] . . . based on the anticipated growth of the company and associated base increase." AR 135081. Upon receiving the Bulletin, the Navy concluded that Vertex's explanation of the [. . .] percent challenge "create[d] some risk, but . . . [that] risk was not significant enough to be identified as a weakness or significant weakness." AR 452.

After the aforementioned discussions, the Navy sought final proposal revisions ("FPR1"). AR 444, 8492. After receiving the FPR1, the Navy reopened discussions. AR 444, 8494. The Navy held discussions with DynCorp regarding an issue of past performance which DynCorp had not had an opportunity to address. AR 134953-56. The Navy did not, however, hold any further discussions with Vertex. AR 452. After discussions with DynCorp were completed, the Navy requested that each offeror submit their second final proposal revisions ("FPR2"). AR 452, 8495. Both Vertex and DynCorp submitted new final proposals.

In its FPR2, Vertex included a change to several labor rates for CLIN 0X08 the largest fixed price CLIN. The change resulted in a price reduction of $[. . .] for CLIN 0X08. AR 138652 (CLIN 0X08 price of $[. . .] in FPR1); AR 138871 (CLIN 0X08 price of $[. . .] in FPR2). In FPR2, Vertex's aircraft maintenance rate ("MMRO rate") for CLIN 0X08 dropped from [. . .] to [. . .] and G&A dropped from [. . .] to [. . .]. AR 8402, 5009. Vertex included a section in its FPR2 entitled "Indirect Rate Substantiation." *Id.* In

the rate substantiation section of Vertex's FPR2, Vertex explained that "G&A Rates will be combined for Vertex as a whole, thereby converting Crestview Aerospace's value-based G&A rate to a total cost input (TCI) rate" which "significantly lowers the overall rate by allocating costs across material and a much larger company-wide pool." *Id.* Vertex further stated that "performing all [Aircraft Conditions Inspections] at Crestview will contribute to an increased aircraft maintenance labor base, which will allow segregation of aircraft maintenance (MMRO) and manufacturing overheads." *Id.* Vertex continued by stating that "an MMRO Overhead Rate has been established using existing costs and historical modification trends for purposes of a basis of estimate on segregated costs and base pool[.]" *Id.* Based on the foregoing, Vertex concluded that the "[. . .] manufacturing rate that was utilized in the proposal included additional challenges . . . on indirect expenses when compared to the MMRO rates shown in the chart below." AR 5009-5010. The FPR2 included a chart titled "Crestview Aerospace 2019-2023 Forecasted Manufacturing Rates" that separated Manufacturing and MMRO rates. AR 5010. The chart showed forecasted MMRO rates from 2019 through 2023 ranging from [. . .] to [. . .]. *Id.*

The Navy noted the change in MMRO and G&A rates in Vertex's FPR2. AR 8402. The Navy reopened discussions to provide Vertex an opportunity to further address the large rate decrease. In the EN sent to Vertex, EN l3-CP-030 ("EN-30"), the Navy explained that it was concerned that Vertex had not substantiated the lower indirect rates it was proposing for CLIN 0X08. *Id.* The Navy stated that the FPR2 "update did not provide detailed substantiation for" the decrease in MMRO and G&A rates. *Id.* The EN

stated that "the Price narrative references future rates as of January 1, 2019, as provided

in Exhibit 3, but the proposal does not include any substantiating document to support the

buildup of those rates as required by the RFP. As such, this may be assessed a weakness."

*Id.* The Navy requested that Vertex submit "any documents, such as an FPRA, FPRR, or

FPRP, used as substantiation for [Vertex's FPR2] proposal." *Id.*

Vertex provided a response to the Navy. AR 8471. In its response, Vertex repeated

much of the same information as it had included in FPR2. *Id.* Additionally, Vertex

acknowledged that its [. . .] MMRO rate was based on "additional challenges (i.e., proven

continuous process improvement efforts)," which modified its rates of [. . .] in 2019, [. . .]

in 2020, [. . .] in 2021, [. . .] in 2022, and [. . .] in 2023 to a [. . .] each year.  AR 8471.

Vertex linked its proposed rates to its "Strategic Plan," which Vertex stated does "not

represent a formal Forward Pricing Rate Proposal."  AR 8471-72.  Vertex stated that

"[t]hese rates represent the most current, complete and accurate rates available based on

information at that time." *Id.* Further, the "rates were submitted to the [Defense

Administrating Contract Officer ("DACO")] for information purposes only, but do not

represent a formal Forward Pricing Rate Proposal (FPRP)." *Id.* Vertex wrote that the

"cost models used to support the planning rates are available to the DACO or DCAA for

purposes of determining adequacy or reasonableness" but "these cost models reflect

preliminary estimates based on the most current available information." *Id.* Vertex was

working to "complete an updated Disclosure Statement and auditable FPRP submittal,"

but had not yet done so.  *Id.*  "Once the Strategic Plan has been completed and approved

by management, those rates will form the supporting basis of our formal FPRP

submission." *Id.*

In reference to Vertex's submission, the government "spoke with the DACO and

he confirmed that [Vertex] had requested certification of the Strategic Plan Rates;

however, the DACO has not reviewed these rates nor has he received a formal FRP from

[Vertex]." AR 137908.

After receiving Vertex's response to EN-30, the Navy requested a third set of final

proposal revisions ("FPR3"). AR 8499. Vertex submitted a letter stating that its

discussion and responses constituted its FPR3. AR 8557. Vertex did not change its

proposal price for CLIN 0X08 in its FPR3. *Id.*

### C.    The Navy's Concerns With Vertex's Failure To Substantiate Its CLIN 0X08 Indirect Rates

The Navy's first evaluation of indirect rates began with the Source Selection

Evaluation Board's ("SSEB") review of the two proposals. The SSEB found that

Vertex's price proposal was "unrealistic due to the indirect rates applied in CLIN 0X08."

The SSEB explained its finding by stating that "Crestview's Overhead and G&A rates

were decreased in FPR2; however, an updated Estimating Bulletin was not provided and

the changes were not reflected in its Price narrative . . . the buildup is inadequate because

[Vertex] did not adequately substantiate the rates it proposed." AR 8561. As part of its

analysis, the SSEB specifically identified Vertex's failure "to verify the decrease in

rates," and Vertex's failure to "provide an updated L-9 attachment in response to [EN-

30].'' AR 8556.  The SSEB also noted that Vertex admitted that its rates were only "preliminary estimates" and had not been approved. AR 8557.

In addition to its report, the SSEB also prepared a brief, which, in relevant part, examined the risk associated with Vertex's failure to substantiate indirect rates.  In the SSEB's brief, the SSEB noted Vertex's failure to substantiate its FPR3 rates, and thus the concern that the CLIN 0X08 buildup, "may lead to underpriced labor efforts equivalent to approximately [. . .] hours per year." AR 8575. The SSEB stated that Vertex's potential under-pricing could adversely impact aircraft availability.  *Id.*

The Navy's Source Selection Advisory Council ("SSAC") also reviewed and considered Vertex's indirect rate proposal. AR 8601. The SSAC determined that Vertex had failed to substantiate its "rates." AR 8599. The SSAC further noted that the Navy had specifically notified offerors that the Navy may assess a significant weakness for proposals that failed to adequately buildup the CLIN 0X08 composite labor rate.  *Id.*

After receiving the SSEB's and SSAC's determinations, the Navy's Source Selection Authority ("SSA") conducted its own "thorough and independent assessment of the facts, findings, and analysis," and the SSA agreed that Vertex's CLIN 0X08 buildup was unsubstantiated and that Vertex had "not sufficiently address[ed] the Evaluation Notice sent requesting substantiation." AR 8609. The SSA further noted that the Navy's focus was on "a low risk technical approach and confidence that the work would be performed successfully."  *Id.*

14

**D.     The Navy's Evaluation of Risks and Final Determination**

For each proposal, the SSEB Report describes the proposed risk reducers the Navy accepted or rejected.  For DynCorp, the Navy rejected twenty-four proposed risk reducers: twelve proposed risk reducers related to the Maintenance and Flight Line Operations Approach; three proposed risk reducers in connection with Operational Experience; one proposed risk reducer related to Manning; five proposed risk reducers related to Transition Phase-In; and three proposed risk reducers related to DynCorp's Quality Control Program Plan.  AR 137860-65.  For Vertex, the Navy rejected fourteen proposed risk reducers:  four proposed risk reducers related to the Maintenance and Flight Line Operations Approach; two proposed risk reducers related to the Operational Experience section; three proposed risk reducers related to Manning; three proposed risk reducers related to Transition Phase-In; and one proposed risk reducer related to Vertex's Quality Control Program Plan.  AR 137874-79. The Navy considered Vertex's proposed trucks with winches as dedicated recovery resources and determined that providing recovery resources was standard and thus was not a risk reducer. AR 8525; *see* AR 14216 (providing effective performance of recovery operations is a requirement in the RFP). The Navy also considered and rejected Vertex's proposed risk reducer for a civilian body to certify Vertex for a quality control program because the Navy preferred to conduct its own oversight of this standard. AR 8524-25.

The SSEB Report also identified the proposed risk reducers the Navy accepted. For DynCorp, the SSEB Report identified eleven risk reducers that benefit the Navy and improved the likelihood of successful performance.  AR 137866-70.  For Vertex, eight

risk reducers were identified.  AR 137879-83. The SSAC expressly considered whether any of Vertex's accepted risk reducers would offset or mitigate the Significant Weakness associated with Vertex's CLIN 0X08 unsubstantiated rates and concluded that "this significant weakness cannot be mitigated by [Vertex's] risk reducers and may, in some cases, neutralize some of the risk reduction benefits cited in the SSEB report."  AR 137952.

In its conclusion, the SSEB stated:

> The lack of adequate substantiation for the composite labor rate for CLIN 0X08 raises the concern that [Vertex] may not be able to staff to the levels needed to meet the required TAT [turn-around time] of 190 days. Delays in TAT would impact aircraft availability and the Offeror's ability to meet the DFS [daily fielding schedule] requirements because of fewer available aircraft. The potential underpricing of the composite labor rate by using the [. . .] aircraft maintenance (MMRO) rate increases the risk to the program and is a significance weakness in [Vertex's] proposal.

AR 8757-58. Thereafter, the SSAC reviewed the evaluation record and concluded:

> A comparison between the Offerors reveals that [DynCorp] has an advantage over [Vertex] in Technical, the most important factor. With respect to Past Performance, [Vertex] has an advantage over [DynCorp] based upon its positive past performance on the current TH-57 CLS [contractor logistics support] effort with no notable adverse past performance without demonstrated systemic improvement.

> When all factors are considered in accordance with the evaluation criteria set forth in the RFP, [DynCorp] has the advantage. [Vertex's] only advantage is in the second most important factor and the benefits derived from that aspect of [Vertex's] proposal are not sufficient to overcome [DynCorp's] advantages in the other factors. [DynCorp] holds an advantage in the Technical factor which is of greater importance than the Past Performance factor. . . . [DynCorp's] TEP [total evaluated price] is slightly lower than [Vertex's] TEP. Further, [Vertex's] price may be low considering the unsubstantiated underpriced rate associated with CLIN 0X08, and, as a result [Vertex] was assessed a significant weakness in the Technical factor because the unsubstantiated price appreciably increases the risk that DFS [daily fielding schedule] requirements may not be met by [Vertex]. In the

> SSAC's opinion . . . [DynCorp's] proposal provides the best value to the
> Government.

AR 8758. Finally, the SSA reviewed the record and performed an independent
assessment. The SSA stated:

> Given the nature of high operational tempo (OPTEMPO) for the TH-57 aircraft
> that conduct Training operations, the Government decided that it would place
> emphasis on having a low risk technical approach and confidence that the work
> would be performed successfully. . . . As a result, according to the [solicitiation]
> criteria, the Government emphasized the risk associated with an acceptable
> technical approach as being the most important consideration in the best value
> decision.

AR 8758-59. The SSA concluded:

> Based on my independent assessment, I agree with the SSAC's comparative
> analysis and recommendation that, in accordance with the evaluation criteria, the
> [DynCorp] proposal provided the best value, all factors considered. Therefore, in
> accordance with the evaluation criteria, I select [DynCorp] for award of the TH-57
> CLS contract.

AR 8759.

The SSA, after reviewing all relevant information and evaluations, determined that

DynCorp offered the superior technical approach. The SSA stated with regard to Vertex's

proposal:

> While on its face, the five additional mechanics appear to provide risk reduction
> benefits, the significant weakness associated with the unsubstantiated rate on
> CLIN 0X08 may negate this benefit because if there are not enough aircraft to
> support the DFS there will be fewer maintenance action; therefore, the
> Government may not benefit from having additional mechanics.

AR 137863. The SSA then compared DynCorp and Vertex's proposal:

> Overall, [DynCorp] has an advantage over [Vertex] in the Technical Factor
> considering the risk associated with [Vertex's] potentially underpriced CLIN
> 0X08 work that increases the risk to meeting the TAT requirement for depot
> conditional work and also the DFS requirement. Further, while [Vertex's]
> Operational Experience is directly relatable to the requirements in this solicitation,
> given that it is the incumbent, [DynCorp] offers comparable operational
> experience through its combined work on a few contracts. [DynCorp] is
> performing work in a high OPTEMP environment on non-rotary wing aircraft and

also has experience performing on rotary wing aircraft at a lower OPTEMP and this combined experience gives the Government confidence that [Dyncorp] will successfully be able to perform the work. [Dyncorp] offered eleven risk reducers, including [. . .] as examples, which are likely to improve its ability to meet the DFS.

AR 137963. The SSA ultimately concluded that DynCorp represented the best overall value to the Government:

> In the final analysis, I had to bear in mind the Section M criteria which named technical as the most important factor. Given my concern that the [Vertex] significant weakness may negate some of the potential risk reducers offered by [Vertex], I stand firm in my assessment that [DynCorp] has an advantage over [Vertex] in the technical factor. While [Vertex] has Operational Experience performing essentially the same requirements as those required by the TH-57 CLS solicitation and two other contracts, [DynCorp] also has comparable Operational Experience through its work across three contracts and this experience, when combined, is indicative that [DynCorp] will be able to meet the requirement of the TH-57 contract. Additionally, [DynCorp's] proposal offers risk reduction in several areas, as compared to [Vertex's], that may provide day-to-day benefit in the maintenance operations to ensure that it can meet the DFS requirements. Further, while [Veretx] has a slight advantage in Past Performance, as demonstrated by a Substantial Confidence Assessment rating, my assessment is that it falls toward the lower end of the Substantial range given that it does have some adverse PPI which remains or has shown only partial systemic improvement. On the other hand, [DynCorp's] past performance falls toward the high end of the Satisfactory range and the remaining instances of adverse PPI described in the SSEB report also document that systemic improvement measures have been implemented, though not yet fully demonstrated. These remaining instances of adverse PPI are not so egregious that it would lessen the confidence of the Government that [DynCorp] could successfully perform the work for the TH-57 contract. Moreover, [DynCorp] offers the lowest priced proposal and does not contain any realism concerns as documented in the SSEB Report. As a result, [Vertex's] only advantage is in the second most important factor and the associated benefits are not sufficient to overcome [DynCorp's] advantages in the other factors, especially in light of the overall order of importance.

AR 137964-65. The Navy made its award to DynCorp on October 12, 2018. AR 137967.

## II.   PROCEDURAL HISTORY

Following the award to DynCorp, Vertex filed a protest before the Government Accountability Office ("GAO").  In that protest, Vertex complained that the Navy had

erred in assigning a Moderate Technical Risk Rating to Vertex's proposal. AR 8759.

Vertex also challenged the Navy's evaluation of its proposal as compared to the Navy's

evaluation of DynCorp's proposal. Vertex claimed that the Navy had reviewed its

proposal too harshly and had not reviewed DynCorp's proposal harshly enough.  *Id*. The

GAO denied the protest on February 5, 2019. The GAO found it "clear" that the Navy

had structured the solicitation "to put offerors on notice regarding the importance of

technical risk and the agency's concerns regarding unsubstantiated price proposals –

particularly with regard to the composite labor rate proposed for CLIN 0X08" and that

there was no basis to "question either the procedures employed in connection with, or the

substance of, the agency's determination that Vertex's FPR2 rates were inadequately

substantiated." AR 8760-61. The GAO also found "no basis to question the agency's

conclusion that Vertex's response to the agency's discussion questions failed to provide

any meaningful substantiation, and actually presented additional indications that the rates

were unreliable." AR 8761. The GAO found Vertex's remaining contentions to be

without merit.  AR 8759, 8761.

Vertex initially filed its action in this Court on February 7, 2019. (ECF No. 1). On

February 19, 2019, Vertex filed an amended complaint. (ECF No. 34). In its amended

complaint, Vertex added a new claim alleging that, on February 12, 2019, it "became

aware" that the Navy "intends to modify the contract" to increase its expectation of

monthly flight hours. Am. Compl. ¶ 69. Vertex supported these allegations with a

declaration from one of its employees. *Id*. at Ex. 13. Based on this, Vertex alleged that the Navy knew that the RFP inaccurately represented the Navy's needs pre-award.

The government and intervenor, DynCorp, filed motions to dismiss Count IV of the amended complaint on February 21, 2019. Def.'s Mot. to Dismiss; DynCorp's Mot. to Dismiss. The government included a declaration from the contracting officer for the DynCorp contract in which she affirmed that she had not modified nor had made any decision to modify DynCorp's contract. The Contracting Officer also stated that the Navy had addressed all of its work needs prior to the contract award through eight amendments to the solicitation and thus did not anticipate changes. Def.'s Mot. to Dismiss at Ex. 1 ¶¶ 3-4. In response, Vertex filed a motion to supplement the Administrative Record with a screenshot of a portion of an email that Vertex asserts proves the Navy's intent to modify DynCorp's contract. Mot. to Supp. At Ex. A.

The parties also filed cross-motions for judgment on the administrative record. Vertex Mot. for J. on the Admin. Rec. ("Vertex's MJAR"); Def. Cross-Mot. for J. on the Admin. Rec. ("Def's MJAR"); DynCorp Cross-Mot. for J. on the Admin. Rec. (DynCorp's MJAR"). Briefing was completed on March 11, 2019. Oral argument was held on March 22, 2019.

## III. STANDARD OF REVIEW

### A. Motion For Judgment On The Administrative Record

This court exercises jurisdiction over a post-award bid protest under 28 U.S.C. § 1491(b). In a bid protest, the court applies the standards set forth in 5 U.S.C. § 706, and

may set aside an award only if the agency's action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1252 (Fed. Cir. 2015) (quoting *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1285 (Fed. Cir. 2010)). An agency's decision is arbitrary and capricious where the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"This standard is 'highly deferential.'" *Sims v. United States*, 125 Fed. Cl. 119, 129-30, (2016), *aff'd*, 655 F. App'x 826 (Fed. Cir. 2016) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). "The court's task is to determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Palladian Partners, Inc.*, 783 F.3d at 1252 (quoting *Savantage*, 595 F.3d at 1285-86). "[W]hen such decisions have a rational basis and are supported by the record, they will be upheld." *NCL Logistics Co. v. United States*, 109 Fed. Cl. 596, 610 (2013) (quoting *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002)). Moreover, the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted). Furthermore, "'[i]f the

court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

In short, the "'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'" *Colonial Press. Intern., Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2013) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). Thus, in procurement decisions, a protestor can prevail only "when it is clear that the agency's determinations are irrational and unreasonable." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1351 (Fed. Cir. 2013) (citing *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

**B.     Motion To Dismiss Due To Subject Matter Jurisdiction**

The standards upon which motions to dismiss for lack of subject matter jurisdiction can be granted are well-settled. *McKuhn v. United States*, No. 18-107C, 2018 WL 2126909, at *2 (Fed. Cl. May 9, 2018). The plaintiff has to establish the court's subject matter jurisdiction by a preponderance of the evidence. *Fid. & Guard. Ins. Underwriters, Inc. v. United States*, 805 F.3d 1082, 1087 (Fed. Cir. 2015) (citing *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013)). "In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

Additionally, the court can "look beyond the pleadings and 'inquire into jurisdictional facts' to determine whether jurisdiction exists." *BRC Lease Co. v. United States*, 93 Fed. Cl. 67, 71 (2010) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)). Here, the court must decide whether Count IV of Vertex's amended complaint is timely. A plaintiff that "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Further, if an offeror "does not claim to have been unaware of the alleged defect" prior to contract award, the offeror cannot protest the solicitation terms after award. *Comint Systems Corp. v United States*, 700 F.3d 1377, 1382 (Fed Cir. 2012).

## IV.    DISCUSSION

The court will address the motions briefed in the following order. The court begins by considering the arguments associated with the cross-motions for judgment on the administrative record with regard to Counts I, II, and II. The court will then turn to Vertex's motion to supplement the administrative record in support of Count IV of its amended complaint and the governments and DynCorp's motions to dismiss Count IV.

### A.    The Navy's Assignment Of A Moderate Risk Rating To Vertex Was Not Arbitrary, Capricious, Nor An Abuse Of Discretion

Vertex alleges that (1) the Navy's determination that Vertex failed "to adequately support its MMRO Overhead rate" and G&A rate was irrational, that (2) even if the determination was rational, it was irrational for the Navy to "assign Vertex a significant weakness on this basis," and (3) that even if Vertex's failure to substantiate its rates

warranted an assignment of a significant risk, it was irrational to give Vertex's proposal a Moderate Technical Risk Rating. Amend. Compl. ¶¶ 77-79, 91-92.

### 1. The Navy's Conclusion That Vertex Failed to Substantiate Vertex's MMRO and G&A Rate Was Rational

Vertex argues that the Navy's conclusion that Vertex's MMRO and G&A rates for fixed price CLIN 0X08 (the largest portion of the work to be contracted) was irrational because according to Vertex its submission "met the [RFP's] requirement  to 'include how [its] burden rates are calculated or built up,'" and because Vertex "provided substantiating data in exactly the same format and level of detail the Agency had previously found adequate." Vertex's MJAR at 9-10 (emphasis removed) (citations omitted). The government and DynCorp respond that the Navy's finding that Vertex had not adequately substantiated its rates was rational because the narrative provided by Vertex indicated "why Vertex believed it was entitled to reduce its indirect rates, but provided no support . . . [for determining whether] the specific reductions it took were accurate." Def.'s MJAR at 12; *see* DynCorp's MJAR at 21. Indeed, the government argues, that Vertex's response to EN-30 only caused more concern by referencing "preliminary estimates" that had not yet been "completed and approved by management." Def.'s MJAR at 12-13 (quoting AR 8471-72); *see* DynCorp's MJAR at 22.

Under the RFP, the Navy put offerors on notice that "for CLIN 0X08, the adequacy of the buildup of the composite labor rate may be assessed a significant weakness under the Technical Factor evaluation." AR 942.  The RFP stated that the "Offeror shall identify the indirect rates . . . used in the proposal." AR 934. The RFP

further stated that the offeror must "identify whether the indirect rates proposed are FPRAs, FPRRs, FRPPs, CBAs, AWDs, ACO/DCAA recommended rates, or Offeror proposed rates." AR 934-35. Under the RFP, "[i]f indirect rate proposals are from other than FPRAs, CBAs, AWDs, ACO/DCMA recommended rates or Offeror proposed rates then the Offeror shall clearly identify the source of the indirect rates and substantiate their buildup." AR 935. The RFP required the offeror to provide any "FPRA, FPRR, FPRP documents used" and "include how the burden rates are calculated or built up." *Id.*

The Navy's concern about Vertex's indirect rates for MMRO and G&A arose when Vertex significantly decreased it rates from its FPR1 to its FPR2 price proposal. The changes are as follows: Vertex's MMRO rate for CLIN 0X08 dropped from [. . .] to [. . .] and G&A rate dropped from [. . .] to [. . .]. AR 8402, 5009. In its second proposal, FPR2, Vertex explained that the MMRO rates had decreased because of a change at the Crestview site that allowed Vertex to separate the MMRO and manufacturing overheads; Vertex stated that it relied on "existing costs and historical modification trends" to estimate the separated MMRO rates. AR 5009. In support of the change, Vertex included a chart entitled "Crestview Aerospace 2019-2023 Forecasted Manufacturing Rates" which showed separated MMRO rates forecasted for future years which ranged from [. . .] to [. . .]. AR 5010. The [. . .] rate Vertex proposed "included additional challenges (i.e. proven continuous process improvement efforts)[.]" *Id.* Regarding the G&A rates, Vertex explained that it had decreased the G&A rates because "G&A rates will be combined for Vertex as a whole" which "lowers the overall rate by allocating costs across . . . a much larger company-wide pool." AR 5008.

In response to Vertex's FPR2, the Navy asked Vertex to further substantiate the decreased MMRO and G&A rates Vertex was proposing. *See* AR 8402 (EN-30). In sum, the Navy identified three problems in EN-30. First, the Navy identified the large decrease in MMRO rates from FPR1. *Id.* Second, the Navy identified the change in Vertex's proposed challenges from a [. . .] challenge to a [. . .] challenge. *Id.* Third, the Navy identified the decrease in G&A rates. *Id.* The Navy stated that "the proposal does not include any substantiating document to support the buildup of those rates as required by the RFP." *Id.* The Navy requested that Vertex submit "any documents, such as an FPRA, FPRR, or FPRP, used as substantiation for [Vertex's FPR2] proposal." *Id.*

In Vertex's response to EN-30, Vertex largely repeated what it had said about the MMRO rates in its FPR2, but added that it was working to "complete an updated Disclosure Statement and auditable FPRP submittal." AR 8472. Vertex explained that its G&A rates had changed because of a business merger and that the FPR2 submission contained the planning rates based on cost models that reflect "preliminary estimates based on the most current information." *Id*. Vertex did not however include an FPRA, FPRR, or FPRP.

When Vertex submitted its third FPR, FPR3, it increased its total evaluated price but did not change the MMRO or G&A rates applicable to CLIN 0X08. Thereafter, the SSEB assigned Vertex a "Moderate" technical rating noting Vertex's failure to provide meaningful substantiation for the proposed indirect rates used to calculated the CLIN 0X08 labor rate. The SSEB found that the change was not substantiated because "an updated Estimating Bulletin was not provided and the changes were not reflected in

[Vertex's] Price narrative[.]" AR 8651. Additionally, SSEB concluded that the rates were not substantiated because Vertex stated that its rates were "preliminary estimates." AR 8557.[14] Finally, the SSEB stated that Vertex "did not provide any documentation to verify the decrease in rates other than a screen shot of the PAMM and G&A rates from the Strategic Plan." AR 137907. However, when the government "contacted DCMA to verify the change in rates[,] DCMA indicated that it had conversations with [Vertex] and that [Vertex] indicated that the rates proposed in FPR2 are internal rates and should not be used in proposals." *Id.*

The SSEB further analyzed Vertex's response to EN-30. The SSEB stated that Vertex "included an updated Price narrative that described the Crestview Aerospace 2019-2023 Forecasted Manufacturing Rates" but that Vertex "proposed an aircraft maintenance (MMRO) overhead rate for Crestview that is not an established rate within the currently approved and signed pricing and Estimating Bulletin." *Id.* "Further, on top of these unapproved MMRO rates, [Vertex] proposed that it will take additional challenges to reach a [. . .] MMRO rate" by engaging "in continuous process improvement efforts[.]" *Id.* Yet, the SSEB stated, Vertex "did not provide any explanation of the specific process improvement efforts and did not substantiate how the

---

[14] Vertex submitted calculations to support its "preliminary estimates" in this proceeding. The court will not consider *post* hoc calculations provided by Vertex in Exhibits A and C to its MJAR that were not before the Navy. These declarations were made after the Navy's award decision. The court's review is limited to the record before the Navy at the time it made its decision. *PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 6 (2009) (striking a declaration that re-argues the merits of an award decision). Vertex has never moved to supplement the record with Exhibits A and C.

implementation of the process improvement efforts would be realized to warrant the

reduction of the rate." *Id.*

> In its conclusion, the SSEB stated:

> The lack of adequate substantiation for the composite labor rate for CLIN 0X08
> raises the concern that [Vertex] may not be able to staff to the levels needed to
> meet the required TAT [turn-around time] of 190 days. Delays in TAT would
> impact aircraft availability and the Offeror's ability to meet the DFS [daily
> fielding schedule] requirements because of fewer available aircraft. The potential
> underpricing of the composite labor rate by using the [. . .] aircraft maintenance
> (MMRO) rate increases the risk to the program and is a significant weakness in
> [Vertex's] proposal.

AR 8757-58.

> Following its review, SSAC agreed "with the SSEB's assessment that the

unsubstantiated rates, do not adequately support the buildup of the composite labor rate

for CLIN 0X08 that led the price realism concern for CLIN 0X08." AR 137950.

Thereafter, the SSA concluded that Vertex "submitted a proposal that contained an

unsubstantiated overhead rate change associated with CLIN 0X08, Depot Conditional

Maintenance Work, and did not sufficiently address the Evaluation Notice sent requesting

substantiation." AR 137962.

> Given the substantial explanations of the SSEB, the SSAC and SSA, the court

cannot conclude that it was irrational for the Navy to have determined that Vertex's

CLIN 0X08 buildup was unsubstantiated. The Navy clearly explained in EN-30 why it

was "unable to verify" the MMRO and G&A rates in Vertex's FPR2 and asked Vertex to

provide "any documents, such as an FPRA, FPRR, or FPRP, used as substantiation[.] AR

8402. The record shows that the Navy fully considered the information provided by

Vertex in response and that the Navy rationally requested additional substantiating information. Moreover, the Navy's request was consistent with the RFP because the RFP required the use of FPRA, FPRR, or FPRP or additional information for substantiation where applicable. *See* AR 934. Vertex was unable to include documents such as an FPRA because the rates were preliminary. When Vertex directed the Navy to the DACO to confirm Vertex's rates, DACO's communications confirmed that Vertex's rates were preliminary and not to be used for proposal purposes.

The court finds, in view of the foregoing, that Vertex's claim that the Navy's decision was arbitrary and capricious because the Navy previously accepted the same amount of substantiation in FPR1 is without merit. In response to the Navy's request for additional substantiation for Vertex's FPR1, Vertex provided Bulletin 003: Forward Pricing Rates. This Bulletin was signed and approved of by Vertex management and effectively substantiated Vertex's proposed rates. AR 135081. It provided historical data substantiating the Manufacturing rate back to 2015 consistent with the Manufacturing rate Vertex forecasted in FPR1. In contrast, Vertex provided no updated Bulletin that reflected MMRO costs separated from other manufacturing rates.[15] Indeed, Vertex conceded that it had not presented final rates. Therefore, it was not arbitrary, capricious, nor an abuse of discretion for the Navy to determine that Vertex had failed to substantiate its indirect rates for CLIN 0X08 as required by the RFP.

---

[15] As noted by DynCorp, the actual data used to substantiate the new MMRO in the Forecasted Manufacturing Rates Chart was inconsistent with Vertex's Bulletin 003: Forward Pricing Rates chart. DynCorp's MJAR at 22. Thus, to the extent that Vertex argues the same Bulletin should have provided enough substantiation to verify the rates, Vertex's argument is unpersuasive.

### 2. The Navy's Assignment of a Significant Weakness to Vertex's Proposal for Failing to Substantiate the MMRO and G&A Rates Under CLIN 0X08 Was Rational

Having determined that the Navy was not irrational in concluding that Vertex had failed to substantiate its indirect rates for CLIN 0X08, the court now turns to Vertex's argument that even if Vertex failed to substantiate its indirect rates, the Navy was arbitrary, capricious, and abused its discretion when it assigned Vertex's proposal a significant weakness based on that failure. Vertex argues that when quantified, the financial and thus performance risk associated with the unsubstantiated rates is "de minimis." Vertex's MJAR at 16. The government and DynCorp argue, in response, that the language of the RFP indicated that Navy did not need to quantify the risk in order to find that a proposal posed a significant risk and therefore the Navy had the discretion, consistent with the RFP, to find Vertex's proposal had a significant weakness without quantifying that risk. Def.'s MJAR at 17-19; DynCorp's MJAR at 25-26. In addition, the government argues that when the Navy endeavored to quantify the impact of Vertex's failure, the Navy found it was significant. Def.'s MJAR at 16. For the reasons that follow, the court agrees with the government and DynCorp.

Whether a price realism finding is rational depends on whether it was consistent with the evaluation criteria set forth in the RFP. *Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 404 (2015) (citation omitted). Here, the RFP stated that the purpose of the price realism analysis was to determine whether proposal prices are "realistic for the work to be performed," "[r]eflect a clear understanding of the requirements," and "[a]re consistent with the various elements of the Offeror's technical proposal." AR 945. The

RFP did not call for a quantification of risk. In addition, the RFP expressly provided that the Navy could assign a significant weakness to a proposal if the offeror failed to adequately substantiate proposed rates for CLIN 0X08. AR 942. Indeed, the Navy warned Vertex in EN-30 that its failure to substantiate the indirect rates "may be assessed as a significant weakness." AR 8470.

The court agrees with the government and DynCorp that the RFP clearly indicated that failure to substantiate proposed rates for CLIN 0X08 could lead to a significant weakness assignment regardless of the dollar value of the unsubstantiated rates. Furthermore, the court finds that the Navy rationally concluded that Vertex's failure to substantiate proposed rates for CLIN 0X08 warranted a significant risk assignment. The SSEB stated that "inadequate substantiation for the indirect rates used in the buildup of the price for CLIN 0X08 is described as a Significant Weakness in the Technical Evaluation." AR 137912. Moreover, with regard to quantification, the SSEB, in reaching its conclusion that Vertex had a significant weakness, examined the impact of Vertex's failure to substantiate; the SSEB calculated that the change in price resulted in [. . .] unaccounted labor hours and that Vertex may have underpriced the effort by [. . .]. AR 8575, 137912.

The SSAC also considered whether Vertex's failure to substantiate "would constitute a weakness" or "a significant weakness." AR 137950. The SSAC "noted that the Government purposely and explicitly informed offerors in the solicitation how important it considered the pricing of this CLIN." *Id.* The SSAC concluded that because of "the unexpected and inadequately explained drop in [Vertex's] pricing of CLIN

0[X]08, and Vertex's failure to provide adequate substantiation when given the opportunity through subsequent discussions, the SSAC agrees with the SSEB's judgment that this flaw in [Vertex's] proposal appreciably increases the risk of unsuccessful performance." AR 137951. The SSA, in her final decision, determined that a significant weakness determination is justified "because it seems unlikely that [Vertex] will be able to staff the depot conditional maintenance work according to its proposed plan and may experience issues meeting the Turn-Around Time (TAT) requirements." AR 137962.

In this connection, the court rejects Vertex's argument that the significant risk assignment was irrational because the Navy's risk assessment was unrelated to Vertex's G&A rates. *See* Oral Arg. 10:45:00-10:51:00. The court agrees with the government and DynCorp that the record shows that the Navy's assignment of a significant risk was based on Vertex's failure to substantiate its indirect rates generally, not just the MMRO rate. The record is clear that when the Navy initially reached out to Vertex in EN-30 the Navy requested substantiation for both MMRO and G&A rates. *See* AR 135408.  The record further shows that the SSEB concluded that "Crestview's Overhead and G&A rates were decreased in FPR2; however, an updated Estimating Bulletin was not provided and the changes were not reflected in its Price narrative" and that "the buildup is inadequate because [Vertex] did not adequately substantiate the rates it proposed." AR 137912; *see also* AR 137950 ("The SSAC agrees with the SSEB's assessment that the unsubstantiated rates, do not adequately support the buildup of the composite labor rate for CLIN 0X08 that led to the price realism concern for CLIN 0X08"); AR 137962 (The SSA stating that she concurs "based on the details in the SSAC's PAR and those within the SSEB report,

that a significant weakness was justified" for Vertex's proposal). Whereas here, the RFP specifically states that failure to substantiate CLIN 0X08's indirect rates could lead to a significant risk assignment and Vertex failed to substantiate its indirect rates for CLIN 0X08 after the Navy requested a better explanation of its significant rate drop, the Navy was not arbitrary, capricious, and did not abuse its discretion in assessing a significant weakness because it concluded the unsubstantiated rates increased the risk of unsuccessful performance.

### 3. The Navy's Assignment of a Moderate Risk Rating for Vertex's Proposal Was Rational

Vertex next argues that the Navy's assignment of an overall Moderate Technical Risk Rating to Vertex was arbitrary, capricious, and an abuse of discretion because the Navy did not properly evaluate the risk reducers submitted by Vertex. *See* Vertex's MJAR at 24-34. In this connection, Vertex argues that the Navy erred in failing to find that Vertex's risk reducers outweighed the significant weakness it received for failing to substantiate its CLIN 0X08 rates. *Id.* at 23. Vertex argues that the Navy's assessment of Vertex's eight risk reducers that the Navy accepted is not supported by the record. Vertex's MJAR at 24. In particular, Vertex challenges the Navy's conclusion that Vertex's "Moderate Risk Rating . . .was not mitigated by its eight risk reducers." AR 137962. Vertex separately argues that the Navy unreasonably rejected two additional risk reducers that Vertex had proposed. Vertex's MJAR at 27.

In evaluating Vertex's argument, the court "'may not substitute its judgment for that of the agency' if the agency's decision is reasonable." *Software Eng'g Servs., Corp.*

33

*v. United States*, 85 Fed. Cl. 547, 552 (2009) (quoting *Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 735 (2007)) (further citation omitted). "'Agency technical evaluations, in particular, should be afforded a greater deference by the reviewing court.'" *Id.* (further citations omitted).

Here, the administrative record shows that the Navy engaged in a detailed analysis of each risk reducer Vertex proposed. AR 8528-32. Each level of review considered Vertex's proposed risk reducers and the Navy found that the risk reducers did not offset Vertex's significant weakness in failing to substantiate the indirect rates for CLIN 0X08. AR 8532, 8601, 8609. In this connection, the Navy's SSA stated:

> While on its face, the five additional mechanics appear to provide risk reduction benefits, the significant weakness associated with the unsubstantiated rate on CLIN 0X08 may negate this benefit because if there are not enough aircraft to support the DFS there will be fewer maintenance action; therefore, the Government may not benefit from having additional mechanics.

AR 137863.

In view of the foregoing, the court cannot find that the Navy's conclusion that Vertex made an acceptable technical proposal, but one in which there was "moderate" risk, based on the failure to substantiate the CLIN 0X08 rates is not supported. *See, e.g.*, AR 8532, 8562.

Further, the administrative record shows that the Navy's rejection of two of Vertex's proposed risk reducers was supported. Contrary to Vertex's contention, the Navy considered Vertex's proposed trucks with winches as dedicated recovery resources but determined that providing recovery resources was standard and thus was not a risk reducer. AR 8525; *see* AR 14216 (providing effective performance of recovery

operations is a requirement in the RFP). The Navy also considered and rationally rejected Vertex's proposed risk reducer regarding Vertex's proposed quality control program on the grounds that the Navy wanted to conduct its own oversight. AR 8524-25.

For all of these reasons, Vertex's contention that the Navy was irrational in failing to find that Vertex's significant weakness was neutralized by Vertex's risk reducers is without merit. The record supports a finding that Vertex's significant weakness was greater than the benefit associated with Vertex's risk reducers and that the Navy rationally rejected two of Vertex's proposed risk reducers.

### B.     The Navy's Evaluation Of The Technical Risk In DynCorp's Proposal Was Not Arbitrary, Capricious, Nor An Abuse of Discretion

Vertex next argues that the Navy's evaluation of DynCorp's risks is not supported by the record. Vertex claims that the Navy, "turned a blind eye to significant risks in DynCorp's proposal" by failing "to address DynCorp's lack of required facilities, required staffing, and relevant experience." Vertex's MJAR at 28. Vertex argues that because the RFP required the Navy to consider "potential disruption of schedule, increased cost, degradation of performance, the need to increase Government oversight, [and] the likelihood of unsuccessful contract performance[,]" AR 15794, the Navy's failure to consider the aforementioned aspects of DynCorp's proposal was arbitrary, capricious, and an abuse of discretion. Vertex's MJAR at 29.

The court finds that the Navy reasonably evaluated DynCorp's ability to provide the required facilities. The RFP required a facility for "phase-in of a depot level maintenance for Aircraft Condition Inspection[.]" AR 928. The record shows that the

Navy found that DynCorp's proposal to reopen an existing facility within fifty miles of Vertex's, the incumbent's, facility would be adequate to meet its operational needs. AR 8513; AR 137864; AR 137948 ("DI also proposed an acceptable maintenance organization . . ."); *Id.* ("DI proposed an acceptable Transition Phase-In approach by detailing the tasking and timelines necessary to complete the transition."). The court cannot conclude that the Navy acted irrationally where the Navy considered DynCorp's proposal and evaluated the proposal's facilities in line with the RFP's requirements.

The court also finds that the Navy reasonably evaluated DynCorp's staffing plan. Vertex argues that DynCorp's plan to "hire a full 95 percent of Vertex's existing workforce" should have been evaluated as a significant risk. Vertex's MJAR at 31. FAR 52.222-17 requires a new awardee to offer employment to the incumbent workforce.[16] AR 8513; AR 882 (incorporating FAR 52.222-17 into contract). Indeed, the transition of a workforce from a prior contractor to a new one is routine and expected. *See IBM Corp. v. United States*, 118 Fed. Cl. 677, 685 (2014) (incumbent's loss of workforce to new contractor is "'the sort[]of thing[] that any incumbent would experience upon the loss of a successor contract'") (quoting *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 26 (2012)). For these reasons, it was not irrational for the Navy to conclude that DynCorp's plan to hire Vertex's workforce by itself, without more, is not a significant risk.

---

[16] 48 C.F.R. § 52.222-17(b) provides that "[t]he Contractor and its subcontractors shall, except as otherwise provided herein, in good faith offer those service employees employed under the predecessor contract whose employment will be terminated as a result of award of this contract or the expiration of the contract under which the service employees were hired, a right of first refusal of employment under this contract in positions for which the service employees are qualified."

The Navy also rationally considered the risks involved in DynCorp's staffing plan. The Navy found that DynCorp's in-house recruiting service was a risk reducer, making it less likely that any openings would remain unfilled if members of the current workforce chose not to work for DynCorp.  AR 8518-19.  The SSEB's report plainly shows the Navy's awareness of both DynCorp's intent to rehire most of the existing workforce and its plan to re-staff if it was unable to do so. AR 8513, 8518-19. Indeed, the Navy rejected DynCorp's proposed risk reducer for hiring incumbent employees on the grounds that under the RFP DynCorp is required to offer employment to incumbent workers. AR 137864. Therefore, the court concludes that the Navy's evaluation of DynCorp's staffing plan was rational and in accordance with the law.

The court further finds that the Navy reasonably evaluated DynCorp's past experience. Vertex argues that the Navy failed to consider the technical risk arising from DynCorp's alleged lack of similar operational experience in a single contract and improperly assigned DynCorp a risk reducer for its past experience. *See* Vertex's MJAR at 33. Specifically, Vertex argues that DynCorp has "no high operational tempo experience with rotary wing-aircraft of any sort." *Id.* (emphasis removed); *see* AR 15780 (requiring offerors to provide past experience with (1) maintenance at high operational tempo; (2) maintenance on rotary wing aircraft; and (3) work under the Naval Aviation Maintenance Program ("NAMP")). The government argues that while it is true that offerors had to demonstrate experience in maintenance at high operational tempo and maintenance on rotary wing aircraft, the RFP did not require offerors to show a single

contract with maintenance of rotary wing aircrafts at high operational tempo. *See* Def.'s

MJAR at 26 (citing AR 927).

The court agrees with the government that DynCorp's past experience rating did

not have to be based on DynCorp's experience under one contract.  Where a solicitation

does "'not require that each reference have experience performing all of the required

work . . . under one contract,'" an agency may reasonably combine referenced contracts

"'to demonstrate successful performance in individual performance areas as required by

the solicitation.'"  *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 172, 212

(2014), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015) (citation omitted).

Given the RFP's standard, the court finds that the Navy's conclusion that

DynCorp "is likely to be able to successfully perform rotary wing operations in a high

[Operations Tempo ("OPTEMPO")] environment," was supported. AR at 137949. The

Navy's conclusion was supported by the fact that DynCorp performed two contracts with

maintenance at high operational tempo and one contract with rotary wing operations. *Id.*

As a result, the Navy determined that DynCorp's proposal presented a Low Technical

Risk.  AR 137870. Although Vertex does not appear to argue that DynCorp does not have

sufficient experience with work under NAMP, this argument would fail because the

record shows DynCorp has performed three contracts under NAMP. AR 137949.

Similarly, Vertex's argument that DynCorp's past experience should not have been a risk

reducer is without merit; the Navy's conclusion is consistent with the RFP and supported

by the facts. Where, as here, the Navy applied the standards in the RFP, evaluated the

facts before it, and provided a reasoned explanation for its conclusion, the court has no

basis for finding the Navy's decision was irrational. The court will not substitute its own judgment nor Vertex's judgment for the Navy's regarding experience.[17] Therefore, the government's and DynCorp's motions for judgment on the administrative record with regard to Counts I and II are **GRANTED** and Vertex's motion for judgment on the administrative record with regard to Counts I and II is **DENIED**.

### C.    The Navy's Best Value Determination Was Not Arbitrary, Capricious, Nor an Abuse of Discretion

In Count III of its amended complaint, Vertex challenges the best value determination made by the Navy. Vertex's states that "the record is clear that Vertex's proposal was at least tied with DynCorp's under the most important evaluation factor, was superior to DynCorp's under the second most important factor, and was only slightly higher priced (the least important factor). Thus, even without correcting any of the other evaluation errors, the SSA should have recognized that Vertex offered the best value to the Government." Amend. Compl. at ¶ 109.

When a contract is to be awarded based upon a best value determination, the agency has greater discretion than if the contract were to be awarded on the basis of cost

---

[17] Because the court concludes that the Navy's consideration of the risks and risk reducers for both Vertex and DynCorp was not irrational, the court finds Vertex's argument that even given the aforementioned conclusions, the Navy's assignment of different Technical Risk Ratings for Vertex and DynCorp was arbitrary, capricious, and an abuse of discretion to be meritless. *See* Vertex's MJAR at 24. Under the terms of the Solicitation, given Vertex's Significant Weakness and the Navy had no choice but to assign Vertex a Moderate Technical Risk Rating absent a finding that the risk reducers sufficiently reduced the relevant risk. *See* AR 944 (defining Moderate Technical Risk Rating as "[p]roposal contains a significant weakness or combination of weaknesses which may potentially cause disruption of schedule, increased cost or degradation of performance."). Therefore, it was not irrational for the SSA evaluate Vertex's proposal with a Moderate Technical Risk Rating and DynCorp's proposal with a Low Technical Risk Rating.

alone. *Galen Med. Assoc.*, *Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004);

*E.W. Bliss Co.*, *v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). In this context, the

relative merit of competing proposals is largely a matter of administrative

discretion. *E.W. Bliss*, 77 F.3d at 449 ("[p]rocurement officials have substantial

discretion to determine which proposal represents the best value for the Government");

*see also Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 264 (2011) (recognizing the

discretion that is afforded to contracting officers in a best value procurement). Indeed, a

best-value determination should not be disturbed so long as the agency documents its

final award decision and includes a reason for any business judgments and tradeoffs

made. *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed. Cl. 488, 514 (2009).

> The SSA reviewed the record, performed an independent assessment, and stated:

> Given the nature of high operational tempo (OPTEMPO) for the TH-57 aircraft that conduct Training operations, the Government decided that it would place emphasis on having a low risk technical approach and confidence that the work would be performed successfully. . . . As a result, according to the [solicitiation] criteria, the Government emphasized the risk associated with an acceptable technical approach as being the most important consideration in the best value decision.

AR 8758-59. The SSA concluded:

> Based on my independent assessment, I agree with the SSAC's comparative analysis and recommendation that, in accordance with the evaluation criteria, the [DynCorp] proposal provided the best value, all factors considered. Therefore, in accordance with the evaluation criteria, I select [DynCorp] for award of the TH-57 CLS contract.

AR 8759.

> The SSA plainly conducted a proper best value analysis consistent with the record.

She noted that the solicitation made the technical factor the most important factor and

that Vertex's "significant weakness" negates some of its potential risk reducers, such that

"DynCorp has an advantage over [Vertex] in the technical factor." AR 137964. The SSA also noted that while Vertex had experience "performing essentially the same requirements" as those in the new contract, that it was "toward the lower end of the [s]ubstanial [confidence] range" because of "some adverse PPI." AR 137964-65. By contrary example, the SSA determined that DynCorp's experience was sufficient to show that "DynCorp will be able to meet the requirement" of the new contract and that its past experience was "toward the high end of the Satisfactory range." AR 137965. The SSA finally considered that DynCorp offered the lowest price before concluding that DynCorp's advantages outweigh Vertex's, "especially in light of the overall order of importance." *Id.* The SSA supported her decision and made determinations within the SSA's discretion. For these reasons, the court cannot find that the Navy's best value determination was arbitrary, capricious, or an abuse of discretion. Therefore, the court **GRANTS** the government's and DynCorp's motions for judgment on the administrative record with regard to Count III and **DENIES** Vertex's motion for judgment on the administrative record for Count III.

### D. Count IV of Vertex's Amended Complaint Must Be Dismissed

In addition to challenging the Navy's decision to award the contract to DynCorp, Vertex also argues that the award to DynCorp must be set aside because the Navy has indicated in an email Vertex attached to its motion to supplement the administrative record that the Navy has certain requirements that cannot be fulfilled under the contract it just awarded to DynCorp. Specifically, Vertex argues that a new solicitation is necessary because the Navy inaccurately represented how many flight hours were required each

41

month in the subject RFP. *See* Vertex's MJAR at 36; *see also* Amend. Compl. at ¶¶ 112-14. In oral argument, Vertex made clear that it was challenging the accuracy of the requirements in the RFP and not making a claim based on Vertex's belief that the Navy's needs will change in the future or that the Navy will in the future modify DynCorp's contract. Oral Arg. 11:53:00-11:54:00.[18]

To the extent that Vertex argues that the RFP failed to accurately reflect the Navy's needs, the court finds that Vertex's argument has been waived. A plaintiff that "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Further, if an offeror "does not claim to have been unaware of the alleged defect" prior to contract award, the offeror cannot protest the terms of the solicitation after award. *Comint Sys. Corp. v United States*, 700 F.3d 1377, 1382 (Fed Cir. 2012). In its amended complaint, which contains the allegations for Count IV, Vertex alleges that as incumbent, it believed that the RFP's requirement for 6,500 hours appeared low based upon historical requirements and that Vertex directly questioned the Navy about the realism of the

---

[18] Because Vertex has clarified the basis of its challenge, the court has no occasion to reach the government and DynCorp's alternative argument for dismissal under RCFC 12(b)(6) nor the merits with regard to Claim IV. Indeed, any such claim would not be ripe. "[A]n agency decision is not ripe for judicial review until the allegedly offending agency has adopted a final decision." *NSK, Ltd. v. United States*, 510 F.3d 1375 1384 (Fed. Cir. 2007). "In the bid protest context, anticipation of a future procurement violation is not sufficient to make a claim ripe." *State of Tex. v. United States*, 134 Fed. Cl. 8, 17 (2017) (internal citations and quotations omitted). Even if the Navy is considering a change in hours, such consideration does not amount to the consummation of the Navy's decision-making process.

requirement on November 14, 2017.  Amend. Compl. ¶ 71; AR 11779, 11784. In its

response, the Navy stated that there are 6500 scheduled hours for CLIN 0X01 and that if

the Navy "requires more scheduled hours than 6500 per month, they will be ordered

under CLIN 0X02." AR 11784. To the extent that Vertex challenges the RFP's accuracy,

it needed to bring that challenge before the award. By not bringing a protest earlier to

raise this issue and waiting until after the contract was awarded, Vertex waived its claim

under Count IV of its amended complaint.

The post-award email Vertex relies on to show that the Navy underestimated the

hours needed in the RFP does not alter the court's conclusion that Vertex's claim is

untimely.[19] The email states that "[f]ull performance for DynCorp would start on 01

June" and that on "01 June, the requirement would be 6,500 scheduled hours/month plus

the 1,500 additional hours/quarter." Vertex's Mot. to Supp., Ex. 1. The email further

states that the Navy may "increase the monthly hours to 8,000/month." *Id.* The court

agrees with DynCorp that the email does not show that the RFP inaccurately reflected the

Navy's requirements. Oral Arg. 11:58:50-11:59:10. To the contrary, the email is

consistent with the RFP because the RFP permits the Navy, through CLIN 0X02, to add

up to 1,500 flight hours quarterly. *See* DynCorp's MJAR at 6; AR 12127 (special

ordering procedures). Because the RFP identifies a potential need for additional hours

---

[19] The court has considered the email submitted by Vertex in its motion to supplement the
administrative record in order to determine whether the court has jurisdiction over Count IV of
Vertex's amended complaint. *See Cedars Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.
Cir. 1993) ("In establishing the predicate jurisdictional facts, the court  . . . may review evidence
extrinsic to the pleadings.")

and explicitly grants the Navy the option to add additional flight hours to meet that need, the email is consistent with the RFP. Thus, the email provides no grounds to make Vertex's claim timely and Count IV is therefore **DISMISSED** for lack of jurisdiction.

## CONCLUSION

For the foregoing reasons, the government's and DynCorp's cross-motions for judgment on the administrative record with regard to Counts I, II, and III are **GRANTED**, and the Vertex's cross-motion for judgment on the administrative record for Counts I, II, and III is **DENIED**. The government and DynCorp's motions to dismiss Claim IV under RCFC 12(b)(1) are **GRANTED**, and Vertex's cross-motion for judgment on the administrative record for Count IV is **DENIED**. Finally, Vertex's motions to supplement the administrative record is **DENIED AS MOOT**. Each party shall bear its own costs. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge